Filed 7/21/26  In re Anthony W. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re ANTHONY W., a Person Coming Under the Juvenile Court Law. | B347376 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 24CCJP01704A) |
| Plaintiff and Respondent, | |
| v. | |
| A.W., | |
| Defendant and Appellant. | |

APPEAL from the findings and order of the Superior Court of Los Angeles County, Dash Talbot, Juvenile Court Referee. Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

Anthony, born June 2014, is the son of appellant A.W. (Father) and nonappealing Mother B.T.  On May 31, 2024, the Los Angeles County Department of Children and Family Services (the Department) filed a dependency petition under Welfare & Institutions Code[1] section 300, subdivisions (a) and (b)(1) on behalf of nine-year-old Anthony.  The Department had received a referral that Mother was Anthony's primary caregiver, she had been diagnosed with paranoid schizophrenia, and she was no longer engaging in treatment or taking her prescribed medications.  Upon inquiry by the Department, Anthony said Mother was not taking her medicine and had been acting strangely for the past few weeks.  Her behavior included extreme anger outbursts.  He also recounted several instances of physical fights between his parents.  Mother was placed on a section 5150 hold.  When interviewed later, Mother said there was domestic violence between her and Father and she had an active restraining order protecting her against him.

Based on this information, the petition alleged a history of domestic violence between the parents in Anthony's presence and Mother's unrelated mental health issues that posed a risk of serious physical harm, damage, and danger to Anthony.  On June 14, 2024, the juvenile court detained Anthony from Father and released him to Mother.  Father was granted monitored visitation.  On July 30, 2024, Mother obtained a temporary restraining order against Father in family court which listed Anthony as a protected party.  Because the temporary restraining order conflicted with the juvenile court's visitation

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

order, the Department paused Father's visits with his son. The Department noted it was unaware of any recent domestic violence between the parents and that the court had previously admonished Mother about interfering with visitation between Anthony and Father. It expressed its concern that the pause in visitation would further alienate the child from Father, which would negatively affect the parent-child relationship. The Department asked the juvenile court to transfer proceedings on the restraining order from family court to juvenile court.

On July 30, 2024, the Department filed an amended petition which added an allegation that Mother had a history of alcohol and marijuana use and currently used marijuana such that Mother was incapable of providing regular care to Anthony. It alleged Mother was convicted in 2023 of driving under the influence of alcohol while Anthony was in the car, resulting in a criminal protective order protecting Anthony from Mother until June 2026.

In August and October 2024, Mother unsuccessfully attempted twice to get the family court and then the juvenile court to issue a restraining order against Father. The court ordered Mother to cease her attempts to undermine the court's orders. It admonished Mother for forum shopping, telling her the child could be removed from her care if she persisted.

In September and October 2024, the juvenile court held a combined jurisdictional and disposition hearing. The court sustained the amended petition only as to the count alleging that Mother has mental and emotional problems for which she failed to regularly take her medication as prescribed; it struck the remaining allegations. Anthony was released to both parents under a Home of Parents order with Mother the primary

custodial parent; a custody sharing plan was ordered; and the parents were ordered to participate in family maintenance services. Father's case plan included parenting and domestic violence classes, individual counseling, conjoint counseling, and family preservation. Mother requested a stay of the custody order, which the court denied. On October 17, 2024, the court admonished Mother "to cooperate and not thwart father's visitation with the minor."

On February 9, 2025, Anthony texted his Mother a photo of himself with a handgun he had found on Father's nightstand while he was at Father's home unsupervised. Anthony told Mother he held the gun which was heavy and then he felt scared so he reached out to her. Anthony later reported Father had left him alone for an hour and Anthony found the gun while searching for his Xbox gift card in Father's bedroom. The gun was on an open shelf in Father's nightstand. Anthony held the gun and then, fearful, he had texted Mother. Mother called law enforcement, reporting there was a loaded magazine next to the gun.

Law enforcement arrived and arrested Father for child abuse, firearm violation, possession of an unsecured firearm, and restraining order violation (Father was under a criminal protective order for domestic violence as a condition of probation). The police report indicated Father denied owning the gun which was found near his wallet and phone, which were on the bed.

Anthony also reported that he thought he saw the gun for the first time earlier that week in the same location in the nightstand. He thought it was a water gun. Anthony said Father had left him alone before, usually for 20 to 60 minutes. After finding the gun this time, Anthony was nervous about

seeing Father and refused to visit with him. The Department thought Anthony was struggling to find a reason not to visit father.

On March 4, 2025, the Department filed a Welfare & Institutions Code section 342 petition alleging that a gun and magazine with live ammunition was found accessible to Anthony in the home. On March 18, 2025, the juvenile court detained Anthony from Father and ordered monitored visits for Father.

Father reported to the Department that on the day of the discovery of the gun, he had a friend staying in his home. He had planned to sleep with Anthony at his girlfriend's home. Father and his girlfriend had an argument so Father and Anthony came home. Father then left Anthony at home alone while he took his friend to another location. Father did not know the gun had been left in his home. He said it was unloaded. He was thankful no one was hurt and he believed Anthony did not touch the gun until Mother told him to do so, manipulating Anthony to Father's disadvantage.

On June 13, 2025, the juvenile court held an evidentiary hearing on the section 342 petition. Father presented the testimony of his friend, Chanel Ellerbe. Ellerbe testified she is a traveling nurse and had been staying at Father's home for about three weeks as of February 7, 2025. On February 7, 2025, Father called and woke her up to tell her she had to leave the residence because he was returning home with Anthony and Father did not want Anthony to see another woman in his home. Father did not want Ellerbe to "run into his son." She packed up her stuff and left around 9:00 p.m., accidentally leaving clothes and the loaded gun at the house. She had the gun for her own safety and Father did not know she had it at the home. She refused to answer

questions about the gun's make, model and ammunition type because it could impact Father's pending criminal case. She said her own boyfriend had given her the gun and she was unaware that it lacked a serial number. She always had the gun with her because she is a single woman in a man's house by herself and needed it for protection. She also did not know about a bulletproof tactical vest that was found at the house but assumed that her boyfriend had included it when he packed up her car to come to California from Texas. Ellerbe had registered two guns in California.

The juvenile court sustained the section 342 petition after amending it to read that Father knew "or should have known" about the gun. It also found Father had violated the criminal protective order prohibiting him from possessing, purchasing or receiving firearms and ammunition. The court stated it would dismiss the section 342 petition if Father admitted he owned the gun and had made a mistake by leaving it accessible to his son. Father did not do so.

The juvenile court found: "[Father] can't admit to it because of the criminal court case and the ramifications it would have there. That then impacts the court's analysis of whether there is a current risk of future risk of harm. Because if he was able to say, yes, the gun is mine and I made a mistake by leaving it out, then the 342, I think, I would dismiss because it is acknowledging an error. The court would not find a future risk of harm. [¶] But because [Father] can't or won't admit to the gun being his, then we have a situation where there is a criminal protective order in place or a prior order in place that does not allow [Father] to have a gun. He is in possession. There is a gun in his home that does not have a serial number. There is a

magazine in there, as well, and there is a bullet proof vest in the home, as well. [¶] I don't find [Ms.] Ellerbe credible at all. She refused to answer basic questions about the gun. She says she is a registered gun owner. Yet, she feigns ignorance when travelling across state lines with a gun with a serial number that has been removed from the gun. She could have legally had a gun in California, as she testified she already does have guns registered to her in California. So I don't find her credible, her testimony credible. [¶] She also indicated that she left in such a hurry because she did not want [the minor] to know that she was there or that she was in a relationship with Father. Yet, she had prior contact with [minor] and drove him to school. [¶] So the court does find that there is a current risk and future risk, based on father's denial of the gun and the bullet proof vest and the magazine being in his home that was clearly in access to [the minor]. He could have picked up the gun, handled the gun. [¶] . . . [¶] And if the gun was not [Father's] and was in fact Ms. Ellerbe's she was in the home for quite some time. She was in the home with what she says is her own bullet proof vest, her other magazine. And the gun is on the nightstand. And I think clearly he should have known that she was in possession of a gun."

On June 13, 2025, the juvenile court sustained the section 342 petition, removed Anthony from Father, terminated dependency jurisdiction, granted sole physical custody of Anthony to Mother and joint legal custody to Mother and Father if the criminal protective order was modified. It ordered monitored visitation for Father as determined by the family court upon modification of the criminal protective order. The court noted the

only reason for the monitored visits was the existence of the criminal protective order.  This appeal followed.

## DISCUSSION

Father argues that the juvenile court should have dismissed the section 342 petition because there was no indication that a similar gun event would happen again in the future.  Any risk of future danger to Anthony posed by Father keeping a loaded gun in the house was entirely speculative and therefore did not support the finding of an ongoing risk to Anthony.  We disagree.

A juvenile court's jurisdictional findings are reviewed for substantial evidence.  Under the substantial evidence standard, we are not permitted to "evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)  Rather we must "draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm if the order is supported by substantial evidence even if other evidence supports a contrary conclusion." (*Ibid.*)  The court considers the entire record to determine whether substantial evidence supports the juvenile court's jurisdictional findings. Substantial evidence is evidence which is reasonable, credible and of solid value.  (*In re I.C.* (2018) 4 Cal.5th 869, 892.)  The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.  (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393–1394, overruled on other grounds in *In re R.T.* (2017) 3 Cal.5th 622, 626–633.)

Father argues that the totality of the evidence establishes there was no indication that a similar event would occur again and therefore no ongoing risk to Anthony.  Father was deemed

8

non-offending in the initial petition when the juvenile court struck the domestic violence counts pertaining to him. He was participating in services and having unmonitored visits with his son. And he was trying to maintain a relationship with his son despite Mother's attempts to create and foster alienation between them.

In support of his position, Father relies on *In re D.L.* (2018) 22 Cal.App.5th 1142. There the court found no evidence of a future risk where Father, who had stored a loaded rifle in a location accessible to the child, recognized that in the future he had to store any gun he owned where no child could access it. In addition, by the time of the hearing, he had moved out of the home and was not welcome to return. (*Id.* at p. 1147.) *In re D.L.* is not dispositive.

Here, we start our analysis with *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 995–996 (*Yolanda L.*). In *Yolanda L*, the father had stored a loaded weapon in a hall closet accessible to his four-year-old and six-month-old children. (*Id.* at pp. 989–990.) We held, "Such conduct indicates 'a gross lack of attention to the child's welfare' with potentially greater repercussions than leaving drugs and paraphernalia within a child's reach." (*Id.* at p. 995.)

In *Yolanda L.*, we concluded that storage of a loaded accessible gun was likely to reoccur because Father was engaged in drug trafficking activity and firearms are "tools of the trade" in the "narcotics business." (*Yolanda L.*, *supra*, 7 Cal.App.5th at pp. 995–996.) We pointed out that the juvenile court need not wait until a child is seriously injured to assume jurisdiction if there is evidence the child is at risk of future harm from the parent's negligent conduct. (*Id.* at p. 993.)

9

To establish a defined risk of harm at the time of the hearing, there must be some reason beyond mere speculation to believe the alleged conduct will recur.  (*In re James R.* (2009) 176 Cal.App.4th 129, 135–136, overruled on other grounds by *In re R.T., supra,* 3 Cal.5th at p. 628.)  Father argues that the "future risk" the court found in *Yolanda L.* was based on the father's ongoing narcotics trafficking business where firearms are the tools of the trade.  He argues there was no such evidence in this case.  That is true.  But the court in *Yolanda L.* arrived at a second conclusion as well, to wit, that "father's lack of insight into the danger posed by the loaded gun in the home provided support for the potential of future risk."  (*Yolanda L., supra,* 7 Cal.App.5th at p. 996.)  Here Father, for whatever reason, declined to acknowledge ownership of the gun and magazine or to even attempt to explain how they happened to end up without his knowledge on an open shelf in his nightstand next to his wallet and phone.  He would not otherwise state that he would do his best to make sure nothing like this happened in the future, a statement that would not have required him to admit any kind of negligence or willful conduct.  The juvenile court expressly gave Father the opportunity to acknowledge he had committed a momentary lapse in judgment and should have known a firearm left openly in a nightstand accessible to a child who was home alone was dangerous.  He did not express anything close to that resolve other than to express relief that his son was not harmed and to acknowledge his son did the right thing in alerting adults to the situation.  It is reasonable to infer that Father's hesitation to own up to what happened as his fault sets the stage for similar events to happen in the future.  "One cannot correct a problem

10

one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

## DISPOSITION

The findings and order of the juvenile court are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.

We concur:


VIRAMONTES, J.


SCHERB, J.

11